**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JAMES L. COMPSTON,**

      **Plaintiff,**

    **v.**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

                        **Civil Action 2:10-cv-818**
                        **Judge GREGORY L. FROST**
                        **Magistrate Judge E.A. Preston Deavers**

**REPORT AND RECOMMENDATION**

      Plaintiff, James L. Compston, brings this action under 42 U.S.C. §§405(g) and 1383(c) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 16), and Plaintiff's Reply (ECF No. 17). For the reasons that follow, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner under Sentence Four of § 405(g).

# I.    BACKGROUND

Plaintiff filed his application for disability insurance benefits with a protective filing date of May 3, 2007, alleging that he has been disabled since April 1, 2007, by reason of gastrointestinal problems, severe abdominal pain, esophagus problems, reflux and digestion problems, high blood pressure and anxiety.[1]  (R. at 102–06, 124.)  The application was denied initially and again upon reconsideration.  (R. at 57–67.)  Plaintiff requested a *de novo* hearing before an administrative law judge.  (R at 71–72.)

On May 18, 2009, Administrative Law Judge Robert S. Habermann ("ALJ") held a video conference hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. at 10–26.)  A vocational expert ("VE") also testified.  (R. at 26–34.)  On August 7, 2009, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 43–54.)  On July 20, 2010, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 2–4.)  Plaintiff then timely commenced the instant action.

# II.    HEARING TESTIMONY

## A.    Plaintiff's Testimony

Plaintiff was born December 12, 1964.  (R. at 11, 102.)  He completed high school with some college education, but no college degree.  (R. at 11, 131–32.)  He has previously worked as

---

[1]A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits.  It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application.

a factory worker, commercial lumber sales person, and security guard.  (R. at 125, 143.)  He lives at home with his wife and two children, ages 12 and 16.  (R. at 11.)

Plaintiff testified that pain prevents him from falling asleep at a regular time and then disrupts his sleep.  (R. at 12.)  He represented that he has not slept in his own bed for two years because sleeping at an angle in a recliner is the only thing that reduces his severe pain enough to allow him to sleep.  (*Id.*)  His wife, in addition to working three jobs, prepares his meals and handles the inside and outside housework.  (*Id.*)  In a typical day, Plaintiff gets dressed, takes his medication, and then sits in a recliner at an angle, reading or watching television.  (R. at 13.)  He spends about six and a half hours of an eight-hour period resting.  (R. at 14.)  He rarely leaves the home beyond going shopping at the grocery store or visiting his parents once per week.  (*Id.*)  When Plaintiff goes grocery shopping with his wife, she drives, and he is only able to walk from bench to bench before having to rest.  (R. at 25.)

Plaintiff testified that his main problem is his GI problem.  (R. at 20.)  He stated that as a result of his GI problems, he has many accidents, including chronic diarrhea anywhere from 15 to 25 times per day.  (*Id.*)  He noted that he also vomits at night.  (*Id.*)  Plaintiff added that food does not pass normally through his system because he can eat something today and throw it up in three days.  (*Id.*)

Plaintiff represented that in an eight-hour period, he has to make 15 or more trips to the restroom.  (R. at 21.)  He stated that when he feels the urge, he must go to the restroom quickly or he will have an accident.  (*Id.*)  Plaintiff added that when he makes these trips to the restroom, they are "not quick."  (*Id.*)

Plaintiff testified that he takes 12 medications per day and also uses a pain patch.  (R. at 22.)  He stated that drowsiness is a side effect of many of these medications.  (*Id.*)  He reported feeling depressed as a result of his physical condition.  (R. at 23.)

**B.      Vocational Expert Testimony**

The ALJ asked the VE, AnnMarie E. Cash, a series of hypothetical questions for an individual with Plaintiff's vocational profile, who could lift/carry twenty pounds occasionally and ten pounds frequently; sit five hours, stand four hours and walk four hours a day; frequently reach overhead, handle, finger and feel; occasionally push pull; frequently use feet for operation of foot controls; occasionally balance, stoop, kneel, crouch and crawl; never climb stairs, ramps, ladders or scaffolds; occasionally be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations; tolerate moderate exposure to noise.  The VE testified that given all of these factors, the hypothetical individual would be able to perform the requirements of representative occupations at the unskilled, light exertional level such as an usher/lobby attendant with 1,450 jobs existing in the regional economy and 115,249 jobs in the national economy; demonstrator type jobs with 495 jobs existing in the regional economy and 21,216 jobs in the national economy; and general office clerk with 5,871 jobs existing in the regional economy and 331,102 jobs in the national economy.  (R. at 29–32.)

The ALJ then asked the VE a second hypothetical based on Plaintiff's testimony of needing to take restroom breaks 10 to 15 times a day.  She responded that there would be no jobs that Plaintiff could perform with "that many breaks."  (R. at 32–33.)

4

### III.    MEDICAL RECORDS

**A.    Russell A. Hartwick, Jr., D.O.**

Plaintiff treated with family practice physician Dr. Hartwick from June 13, 2006, through February 19, 2009.  (R. at 222–41, 281–91, 364–75, 396, 428–30, 454–60.)  During this time period, Dr. Hartwick treated Plaintiff for chronic pain and diarrhea, anxiety, chronic pancreatitis and GERD, pneumonia, and right upper quadrant pain that radiated into his back.  (*Id.*)  Dr. Hartwick prescribed Lipitor, Lisonopril, Toprol, Norco, Lexapro and Duragesic patches.  (*Id.*)

A September 2006 CT scan of the abdomen showed a diffuse fatty infiltration of the liver; grossly normal gallbladder, spleen, pancreas and adrenal glands; no kidney abnormalities; and a normal bowel.  (R. at 310–11.)  The findings indicated no acute abdominal abnormality. (*Id.*)

On May 20, 2009, Dr. Hartwick completed a medical questionnaire on Plaintiff's behalf. (R. at 489.)  Dr. Hartwick reported that he had treated Plaintiff approximately twenty-seven times since at least June 13, 2006.  (*Id.*)  He opined that due to Plaintiff's numerous gastrointestinal impairments, he would need to take five or more restroom breaks during an eight-hour work day. (*Id.*)  He added that this amount of restroom breaks would have been necessary since April 1, 2007.  (*Id.*)

**B.    Lisa L. Choung, M.D.**

Dr. Choung, a pain management specialist, saw Plaintiff on September 22, 2006.  (R. at 219-21.)  Plaintiff complained of constant aching, stabbing, and burning in his upper right quadrant.  (*Id.*)  He ranked his pain at five on a ten-point scale.  (*Id.*)  Plaintiff further reported that his pain is worsened by stress, lying down on his left side, walking, bending, and twisting.

5

(*Id.*)  Dr. Choung's examination of Plaintiff's abdomen a revealed soft, tender right upper

quadrant.  (*Id.*)  No rebounding or guarding was noted.  (*Id.*)  No organomegaly was noted.  (*Id.*)

Dr. Choung did note, however, that Plaintiff had some mild epigastric tenderness upon deep

palpation.  (*Id.*)  She diagnosed chronic right upper quadrant abdominal pain of unclear etiology

and esophageal spasms.  (*Id.*)  She recommended that Plaintiff change to a Duragesic patch for

pain management.  (*Id.*)

Plaintiff underwent a right upper quadrant ultrasound which revealed no evidence of

acute cholecystitis or cholelithiasis.  (R. at 412.)

In April, July, and August 2007, Plaintiff ranked his stomach pain at one on a ten-point

scale.  (R. at 321, 324, 330.)  On August 31, 2007, Plaintiff ranked his pain at five on a ten-point

scale.  (R. at 320.)

Plaintiff underwent a right upper quadrant ultrasound on September 5, 2008, which

showed a fatty infiltration of the liver, a normal gallbladder, and a normal bile duct.  (R. at 412.)

There was no evidence of acute cholecystitis or cholelithiasis.  (*Id.*)  In October 2008, Plaintiff's

pain medications were changed, he was advised to discontinue using Duragesic and begin

using Kadian.  (R. at 447.)

On January 8, 2009, Plaintiff reported to Dr. Choung that his abdominal pain had

worsened and that the Duragesic patches were no longer as helpful for his pain management.  (R.

at 441.)  Plaintiff was prescribed Methadone.  (*Id.*)  On March 3, 2009, Dr. Choung noted that

Plaintiff planned to have a cholecystectomy.  (R. at 464.)   She refilled his prescription for

Duragesic.  (*Id.*)

6

C.      **Holzer Clinic**

Plaintiff underwent a esophagogastroduodenoscopy and biopsies and a total colonoscopy and biopsy on May 12, 2009, which showed evidence of chronic bile reflux gastritis.  (R. at 378–87.)

D.      **James C. Tanley, Ph.D.**

On August 10, 2007, Dr. Tanley conducted a psychological examination of Plaintiff on behalf of the Bureau of Disability Determination ("BDD").  (R. at 250–52.)  Plaintiff reported that he ate once per day and got diarrhea twenty times per day.  (*Id*.)  He felt worthless because he could not provide for his family.  (*Id*.)  Plaintiff also reported that he usually got up by 11:00 a.m. and went to bed around 2:00 a.m.  (*Id*.)  He stated that he tried to watch his kids, picked up the living room, cleaned the dishes, laundry, and performed chores that were not strenuous.  (*Id*.)  He indicated that he used to hunt and fish but did not any longer.  (*Id*.)  Dr. Tanley noted that Plaintiff was generally cooperative.  (*Id*.)  His affect was appropriate, and his eye contact was good.  (*Id*.)  He was alert and oriented.  Dr. Tanley opined that Plaintiff's current level of intellectual functioning appeared to be in the average range.  Day to day functioning was fair. (*Id*.)  Dr. Tanley diagnosed an adjustment disorder with depressed mood, chronic; and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 60.[2]  (*Id*.)  Dr. Tanley opined that Plaintiff was moderately impaired in his ability to withstand the stress and pressure of daily work due to his conditions; but he was able to comprehend, remember, and carry out simple task

---

[2]A GAF score of 51-60 is indicative of some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33-34.

instructions; and maintain attention to perform simple, repetitive tasks.  (*Id.*)

**E.**     **David Dietz, Ph.D.**

On August 24, 2007, Dr. Dietz, a state agency psychologist, performed a mental functional capacity assessment and completed a psychiatric review.  (R. at 255–71.)  Dr. Dietz opined that Plaintiff was mildly impaired in his activities of daily living; moderately impaired in maintaining social functioning; and mildly impaired in maintaining concentration, persistence, or pace.  (R. at 265.)  Dr. Dietz also opined that Plaintiff was moderately limited in his ability to understand, remember, and follow detailed instructions.  (R. at 269.)  He concluded that Plaintiff was moderately limited in his ability to complete a normal work week or work day and in his ability to accept instructions and respond appropriately to criticism.  (R. at 270.)

**F.**     **Gary Hinzman, M.D./Esberdado Villanueva, M.D.**

Dr. Hinzman conducted a physical residual functional capacity assessment on September 6, 2007.  (R. at 273–80.)  Dr. Hinzman opined that Plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds, and he could stand, walk or sit with normal breaks for a total of six hours in an eight hour workday.  (R. at 274.)  Dr. Hinzman also opined that Plaintiff could only occasionally climb stairs or crouch, but could never climb a rope, ladder, or scaffold.  (R. at 275.)  Dr. Hinzman also indicated that Plaintiff would need to avoid concentrated exposure to hazards.  (R. at 277.)  Dr. Hinzman reported that due to Plaintiff's pain, weakness, and fatigue related to his conditions and the medications he uses to treat them, Plaintiff should avoid work around unprotected heights, ladders, scaffolds, dangerous machinery, and commercial driving.  (*Id.*)  Dr. Hinzman also reported that Plaintiff suffers from pain in his left abdomen and back due

to pancreatitis.  Dr. Hinzman concluded that Plaintiff's statements were partially credible in his

description of his condition and his limitations.  (R. at 278.)  Another state agency

reviewing physician, Dr. Villanueva, affirmed Dr. Hinzman's assessment on January 24, 2008.

(R. at 355.)

**G.     Michael A. Tzagournis, M.D.**

On November 7, 2007, Plaintiff underwent a colonoscopy.  (R. at 292–94.)  Dr.

Tzagournis reported that he found and removed a 5mm polyp in the ileocecal valve.  (R. at 293.)

He also found a few small and large mouthed diverticula in the sigmoid colon.  (*Id*.)

Plaintiff underwent an upper GI endoscopy on January 25, 2008, which showed a normal

small bowel duodenum; a gastric mucosal abnormality characterized by erythema (redness); a

z-line irregularity at the gastroesophageal junction; and normal esophagus.  (R. at 391–94.)

**H.     Phillip Swedberg, M.D.**

On November 13, 2008, Dr. Swedberb examined Plaintiff on behalf of the BDD.  (R. at

397–400.)  Plaintiff complained of daily diarrhea, but he denied weight loss.  (R. at 407.)  Dr.

Swedberg's examination revealed that Plaintiff's extremity strength was normal.  (R. at 397–98.)

In addition, his motion of the lumbosacral spine was reduced, but his motion of the cervical

spine and extremities was normal.  (R. at 398–400.)

When completing a Medical Source Statement of ability to do work-related activities, Dr.

Swedberg indicated that Plaintiff could never lift or carry any amount of weight.  (R. at 401.)  He

reported that Plaintiff could only sit for fifteen minutes at one time without interruption and walk

for five minutes at one time without interruption.  (R. at 402.)  Dr. Swedberg opined that in an

eight-hour work day, Plaintiff could only sit for two hours total, stand for four hours total, and

walk for two hours total.  (*Id.*)  He also opined that Plaintiff could occasionally use his hands to reach, handle, and feel, and could occasionally use foot controls, but could never push or pull. (R. at 403.)  Dr. Swedberg reported that Plaintiff could never climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.  (R. at 404.)  Dr. Swedberg further reported that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, or vibrations.  (R. at 405.)  He opined that Plaintiff's condition renders him unable to shop, travel without a companion for assistance, walk a block at a reasonable pace on rough or uneven surfaces, or prepare a simple meal and feed himself.  (R. at 406.)

In completing the narrative portion of his examination findings, Dr. Swedberg reported that Plaintiff was 5' 8" tall and weighed 324 pounds.  (R. at 408.)  Plaintiff's gait was normal without the use of ambulatory aids.  (*Id.*)  He had mild right upper quadrant tenderness with deep palpation. (*Id.*)  Dr. Swedberg noted that Plaintiff was morbidly obese and that weight reduction would obviously be beneficial.  (R. at 410.)  He concluded that based on the findings of his examination, Plaintiff was capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying.  (*Id.*)  In addition, he reported that Plaintiff had no difficulty reaching, grasping, and handling objects.  He further indicicated that Plaintiff had no visual, communication, or environmental limitations.  (*Id.*)

On January 21, 2009, Dr. Swedberg again assessed Plaintiff's ability to do physical work-related activities.  (R. at 431–37.)  He reported that Plaintiff could lift/carry up to twenty pounds occasionally and ten pounds frequently; sit five hours, stand four hours and walk four

hours; frequently reach, handle, finger and feel; occasionally push/pull; frequently operate foot controls; never climb ladders, stairs, ramps or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; occasionally be exposed to environmental hazards; and be exposed to moderate noise.  (R. at 431–35.)  He further opined that Plaintiff could shop and travel without assistance; not walk at a reasonable pace on an uneven surface; and use public transportation, climb a few stairs without a handrail, prepare a simple meal, and work with paper or files.  (R. at 436.)

I.     **Cleveland Clinic/Tyler K. Stevens, M.D.**

On February 16, 2009, Dr. Stevens at the Cleveland Clinic evaluated Plaintiff's abdominal pain.  (R. at 482–86.)  Plaintiff complained of right upper quadrant pain and diarrhea twenty times a day.  (R. at 482.)  Plaintiff also stated he had lost thirty pounds in the past six months.  (*Id*.)  Dr. Stevens recommended diagnostic tests.  (R. at 484.)  Plaintiff underwent an endoscopic ultrasound on April 8, 2009, which showed a grossly normal pancreas.  (R. at 473.)  A pancreatic function test showed mildly abnormal function, possibly indicating a mild form of chronic pancreatitis.  (*Id*.)  Dr. Sevens diagnosed moderate to severe gastritis.  (*Id*.)  Biopsies revealed reactive gastropathy.  (*Id*.)  Plaintiff underwent a hepatobiliary scan on April 9, 2009.  (R. at 486.)  The results showed an abnormal gallbladder ejection fraction, or poor emptying of the gallbladder, which Dr. Stevens opined may be an etiology for Plaintiff's pain.  (*Id*.)  Dr. Stevens suggested that it might be worthwhile to consider a cholecystectomy.  (*Id*.)

Also on April 9, 2009, Plaintiff Dr. Stacy Brethauer at the Cleveland Clinic evaluated Plaintiff.  (R. at 469–72.)  Dr. Brethauer noted that Plaintiff has had right upper quadrant pain for sixteen years and had a gallbladder ejection fraction of sixteen percent.  (R. at  470.)  She assessed chronic right upper quadrant pain and biliary dyskinesia.  (*Id*.)  She also noted that the

amount of narcotics Plaintiff took could affect the results of the test. (*Id.*) Dr. Brethauer reported that Plaintiff's abdomen was tender only in the right upper quadrant. (*Id.*)

On June 8, 2009, Dr. Stevens completed a medical questionnaire wherein he reported that he began treating Plaintiff on February 16, 2009, and had treated Plaintiff one time. (R. at 491.) He opined that Plaintiff would need to take five or more restroom breaks during an eight-hour working day, and that Plaintiff would have needed this many restroom breaks since April 1, 2007. (*Id.*)

**J.      H.C. Alexander, III, M.D./Medical Expert**

The medical expert, Dr. Alexander, completed interrogatories on June 26, 2009. (R. at 492–94.) Following his review of the medical evidence, Dr. Alexander concluded that Plaintiff's impairments included gallbladder dysfunction/dyskinesia; chronic gastritis due to bile reflux; low testosterone levels; benign colon polyps; esophageal spasm/reflux; diffuse fatty liver; irritable bowel syndrome; intermittent constipation/diarrhea; varicose veins; and hypertension and hyperlipidemia. (R. at 492.) Dr. Alexander opined that, upon his clinical experience and the absence in the record of abnormal amylase/lipase values, CT/x-ray signs of chronic/acute pancreatitis, or hospitalizations for same, chronic pancreatitis was not established. (*Id.*) He also opined that severe incapacitating diarrhea was not objectively supported in the record, referencing the absence of documentation of the expected dehydration, malabsorption, celiac disease, inflammatory bowel disease, significant weight loss, or significant efforts by physicians to treat this condition. (*Id.*) He noted that Plaintiff's weight ranged from 351 pounds on September 7, 2008, to 338 pounds on April 9, 2009. (*Id.*) Dr. Alexander opined that none of Plaintiff's impairments, combined or separately, meet or equal any impairment described in the

12

listing of impairments.  (*Id.*)  He opined that the medical evidence did not support Plaintiff's allegations of right upper quadrant pain through to the back, epigastric pain, rectal bleeding, vomiting blood, diarrhea, constipation, and weight loss.  (R. at 493.)

The record contains additional medical evidence, including records from the Cleveland Clinic.  (R. at 501–20.)  That evidence was not before the ALJ.  Rather, Plaintiff submitted it to the Appeals Council.  Because the Appeals Council denied Plaintiff's request for review, however, that evidence is not a part of the record for purposes of substantial evidence review of the ALJ's decision.  *Cline v. Commissioner of Social Security,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).

## IV.   THE ADMINISTRATIVE DECISION

On August 7, 2009, the ALJ issued his decision.  (R. at 43-54.)  The ALJ concluded that Plaintiff had the severe impairments of morbid obesity; right upper quadrant pain, etiology uncertain; esophageal spasms; history of fatty liver; history of diverticulosis; sinus bradycardia; and an adjustment disorder with depressed mood.  (R. at 45.)  Next, the he concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. at 46.) He considered the criteria of listings 4.01 *et seq*. (cardiovascular system), specifically 4270 (cardiac dysrhythmias); and 5.01 *et seq*. (digestive system), specifically 5300 (diseases of esophagus), 5710 (chronic liver disease), and 5690 (other disorders of gastrointestinal system). (*Id.*)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work.  Specifically, the ALJ found that:

> [Plaintiff] can lift/carry 20 pounds occasionally and 10 pounds frequently; sit for 5 hours out of 8; stand/walk for 4 hours out of 8; frequently reach (overhead and all other), handle, finger and feel; occasionally push/pull; frequently use feet for operation of foot controls; occasionally balance, stoop, kneel, crouch and crawl; never climb stairs and ramps, ladders or scaffolds; occasional exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibrations; and can tolerate moderate exposure to noise.  His mental impairment impacts to the extent that he has moderate restriction in ability to withstand the stress and pressure of daily work.

(R. at 47–48.)  Considering Plaintiff's age, education, work experience, and RFC, the ALJ

further found that there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform.  (R. at 53.)  He therefore concluded that Plaintiff had not been disabled

under the Social Security Act.  (R. at 54.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C.

§ 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

14

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

In his Statement of Errors, Plaintiff challenges the ALJ's decision on two grounds. First, Plaintiff contends that the ALJ failed to accord adequate weight to the opinions of his treating physicians. Second, Plaintiff asserts that the ALJ erred in failing to find the additional severe impairments of irritable bowel syndrome and gastritis at step two of the sequential evaluation process. For the reasons that follow, the undersigned finds that the ALJ's failure to provide good reasons for the weight accorded to Dr. Hartwick's opinion concerning Plaintiff's gastrointestinal impairments warrants remand.[3]

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ."  20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d 399, 408 (6th Cir. 2009).  To qualify as a treating source, a physician must have "examined the claimant . . . [and have] an 'ongoing treatment relationship' with [the claimant] consistent with accepted medical practice."  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1502).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

Even if the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must still meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion."  20 C.F.R. § 404.1527(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.  *Friend v. Comm'r of Soc. Sec.*, No.

16

09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted).  The United

States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason

requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir. 1999).  The requirement also ensures that the ALJ applies the
> treating physician rule and permits meaningful review of the ALJ's application of
> the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  The Sixth Circuit recently reiterated this standard:

> "[w]e do not hesitate to remand when the Commissioner has not provided 'good
> reasons' for the weight given to a treating physician's opinion and we will
> continue remanding when we encounter opinions from ALJ's that do not
> comprehensively set forth reasons for the weight assigned to a treating
> physician's opinion."

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545 (internal

quotations omitted)).

In the instant case, the ALJ violated *Wilson's* good-reason rule.  The parties do not

dispute that Dr. Hartwick is a treating source subject to the good-reason rule.[4]  After setting forth

----

[4]In contrast, contrary to Plaintiff's assertion, Dr. Stevens—who examined Plaintiff just
once before rendering his opinion—does not qualify as a treating source.  To qualify as a treating
source, the physician must have an "ongoing treatment relationship" with the claimant.  20
C.F.R. § 404.1502.  A court must determine whether or not an ongoing treatment relationship
exists at the time the physician's opinion is rendered.  *Kornecky v. Comm'r of Soc. Sec.*, No. 04-
2171, 167 Fed. Appx. 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether
[claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*.
[V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating
physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 Fed. Appx.
883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term
overview of [the claimaint's] condition.").  This is because "the rationale of the treating
physician doctrine simply does not apply" where a physician issues an opinion after a single

Plaintiff's RFC, the ALJ summarized the medical record, devoting just a single sentence to Dr. Hartwick:  "On May 20, 2009, Dr. Russell Hartwick completed a Medical Questionnaire from wherein he opined the claimant would need to take 5 or more restroom breaks during an 8-hour working day; and would have needed this many restroom breaks since April 18, 2007."  (R. at 50.)  The ALJ then stated that he had "fully considered the treatment records from . . . Dr. Hartwick . . . and give[s] them some weight in conjunction with other relevant evidence to the extent that the claimant is precluded from job tasks beyond the light level of exertion."  (R. at 52.)  The ALJ, in violation of *Wilson's* good-reason rule, fails to provide reasons for assigning Dr. Hartwick's opinion only "some weight."

The ALJ's violation of the good reason rule with regards to Dr. Hartwick's opinion was not harmless error.  The *Wilson* Court considered three possible scenarios that could lead the Court to a finding of harmless error.  378 F.3d at 547.  First, the Court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . . ."  *Id.*  Second, the Court noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant."  *Id.*  Finally, *Wilson* considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation."  *Id.*  Since *Wilson*, the Sixth Circuit has continued to conduct a harmless error analysis in cases in which the claimant asserts that the ALJ failed to comply with the good-reason requirement.  *See, e.g.*,

examination.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

*Nelson v. Comm'r of Soc. Sec.*, 195 F. A'ppx 462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-reason requirement the ALJ met the goal by indirectly attacking the consistency of the medical opinions); *Bowen*, 478 F.3d at 749 (finding that the facts did not satisfy potential harmless error justifications).

In this case, Dr. Hartwick's opinion is not "so patently deficient that the Commissioner could not possibly credit it." *Wilson*, 378 F.3d at 547. Second, the ALJ's decision is not consistent with Dr. Hartwick's opinion. Dr. Hartwick opined that Plaintiff would need at least five restroom breaks per day. This number of breaks is more than the usual number of breaks an employer provides to an employee.[5] The ALJ, however, made no specific findings concerning the frequency and duration of Plaintiff's bathroom usage.[6] Additionally, he failed to incorporate into Plaintiff's RFC any limitations relating to Plaintiff's need for unscheduled, frequent

---

[5] *See e.g.*, *Taylor v. Barnhart*, 474 F.Supp.2d 650, 669–70 (D. Del. 2007) (VE testified that four unscheduled breaks of fifteen minutes in length in a normal workday would exceed normal work tolerances); *Rush v. Barnhart*, 432 F.Supp.2d 969, 984 (D. N. Dak. 2006) (VE testified that normal breaks during workday would be 15-minute breaks in the morning and afternoon); *Smith v. Comm'r of Soc. Sec.*, No. 09-182, 2009 WL 2762687, at *7 (W.D. Pa. 2009) (VE testified that it is customary for an employer to give an employee three breaks during the workday); *Brueggen v. Barnhart*, No. 06-C-0154-C, 2006 WL 5999614, at *2 (W.D. Wisc. Dec. 15, 2006) (VE testified that for unskilled work, bathroom breaks would typically be limited to the "normal" morning, lunch, and afternoon break periods); *Metzger v. Barnhart*, No. 03-3368, 2004 WL 2092010, at *5 (D. Minn. Sept. 16, 2004) (VE testified that an employer would not tolerate anything beyond a roughly fifteen-minute break in the morning and afternoon and a thirty-minute lunch).

[6] Other courts have reversed and remanded in cases in which a social security claimant's impairment requires him or her to have "ready access to a bathroom," but the ALJ fails to "make a specific finding concerning the frequency and duration of [the claimant]'s bathroom usage" as part of the statement of the claimant's RFC. *See e.g.*, *Brueggen*, 2006 WL 5999614, at *7 (remanding so the ALJ "can make a specific finding concerning the frequency and duration of plaintiff's bathroom usage and determine whether, in light of those findings, plaintiff is able to work"); *Green v. Astrue*, No. 3:09-CV-331, 2010 WL 2901765, at *6 (E.D. Tenn. July 2, 2010) (remanding because of "the ALJ's failure to specify precisely how Plaintiff's need for frequent restroom breaks impacted her ability to work")

restroom breaks. Although the ALJ determined, through the VE's testimony, that Plaintiff would be unemployable if he needed 10-15 restroom breaks per day, he failed to obtain the VE's testimony regarding how the need for five or more restroom breaks would affect Plaintiff's ability to sustain full-time work. Thus, it is unclear whether, if adopted, Dr. Hartwick's opinion would dictate a finding that Plaintiff is unable to engage in competitive employment as a result of his medical conditions. Finally, the ALJ's decision does not otherwise meet the goals of *Wilson's* reason giving requirement.

In sum, the undersigned finds that the ALJ's failure to give good reasons for not according controlling weight to Dr. Hartwick's opinion warrants remand.

## VII. CONCLUSION

Accordingly, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: July 18, 2011                                  */s/ Elizabeth A. Preston Deavers*
                                                     Elizabeth A. Preston Deavers
                                                     United States Magistrate Judge

21